*E-FILED - 10/5/10*

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| KYLE WHELAN AVERY, | No. C 03-4233 RMW (PR) |
| Plaintiff, | ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT |
| vs. | |
| CORRECTIONAL OFFICER THOMPSON, | (Docket No. 51) |
| Defendant. | |

Plaintiff Kyle Whelan Avery, a state prisoner, brought this case under 42 U.S.C. § 1983 against officials at San Quentin State Prison ("SQSP"), where he was incarcerated at the time of the underlying events. Plaintiff alleges that defendant Thompson unlawfully deprived him of property and violated his First Amendment rights to freedom of speech and religion. The Court ordered service of plaintiff's second amended complaint ("SAC") upon Thompson. On September 11, 2009, Thompson filed a motion for summary judgment on the grounds that no triable issue of material fact exists and that he is entitled to judgment as a matter of law. Plaintiff filed an opposition and Thompson replied.

Having carefully considered the underlying pleadings and for the reasons discussed below, Thompson's motion for summary judgment is GRANTED IN PART and DENIED IN PART.

Order Granting in Part and Denying in Part Defendants' Motion for Summary Judgment
P:\PRO-SE\SJ.Rmw\CR old\CR.03\Avery233msj.wpd

**BACKGROUND**[1]

On June 28, 2002, after plaintiff attended a court hearing, he was placed in SQSP ad seg while waiting for transport back to his institution at Tehachapi State Prison. (SAC at ¶ 6.) When he arrived at SQSP, his property was taken to be inventoried. (Id.) All property is to be inventoried upon arrival; however, only permitted property items are allowed while in administrative segregation. (Id.) Only when a prisoner is released from administrative segregation may he recover any remaining items which may have been confiscated or stored. (Id.) At that time, Defendant Thompson was responsible for processing and storing property belonging to new inmates. (Id.; Decl. Thompson at ¶ 2.)

On July 1, 2002, plaintiff received all of his permitted property as well as a receipt of the inventory list which stated, "no hot property". (SAC at ¶ 7.) After looking through his property, plaintiff noticed that his religious-based study materials were missing. (Id.) In fact, prison officials confiscated 265 pamphlets, all of which were published by 14 Word Press. (MSJ at 3.) 14 Word Press[2] is a publishing a company founded by white-supremacist David Lane. (Request for Judicial Notice, Ex. A.)[3] The company sold white supremacist paraphernalia as well as Lane's many writings. (Id.)

Plaintiff inquired about his missing materials and, on July 2, 2002, Thompson replied, "It's with I.S.U." (SAC at ¶ 7.) I.S.U. stands for Investigative Services Unit. Plaintiff filed several inmate appeals asking why his materials were confiscated and finally received a response

---

[1] The following facts are undisputed except where indicated.

[2] "14 Words" is a motto created by Lane, meaning, "We must secure the existence of our people and a future for white children." (Request for Judicial Notice, Ex. A.)

[3] Federal Rule of Evidence 201 allows a court to take judicial notice of a fact "not subject to reasonable dispute in that it is either (1) generally known within the territorial jurisdiction of the trial court, or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." "A court shall take judicial notice if requested by a party and supplied with the necessary information." Fed. R. Evid. 201(c). A court "may take judicial notice of a record of a state agency not subject to reasonable dispute." City of Sausalito v. O'Neil, 386 F.3d 1186, 1223 n. 2 (9th Cir. 2004). Thompson's unopposed Request for Judicial Notice is granted.

that the materials were confiscated because I.S.U. concluded the materials were not religious-based but propagated "neo-Nazi" and white supremacy beliefs instead. (Id. at ¶¶ 8-9; Opp. Ex. 4; Decl. Quinn ¶ 5.)

Plaintiff disputed this finding, arguing that the material was not racist; rather his religious belief maintains that "it is racial genocide to involve one's self with or by mixing cultures." (Opp. Ex. 4.) Plaintiff goes on to explain that Odinism is an Aryan culture but it was not synonymous with "neo-Nazi." (Id.) Finally, plaintiff suggests that if he could not have his property returned, he would like to be compensated either by payment of $265.00 – the cost to replace the pamphlets – or a 13 inch television set, head phones, a cable, and splitter. (Id.) After plaintiff was interviewed, on September 30, 2002, his first level review was denied because he failed to provide proof that the pamphlets met the criteria for being legitimate religious materials. (Id.)

Plaintiff appealed this decision. (Id.) He stated that he was a firm believer in his Wotanism faith. (Id.) Plaintiff asserted that he had "already replenished the liturature [sic] and now have pretty much a bundle of the same type of materials that I re-coped [sic]." He explained that he was continuing with the grievances because I.S.U. violated his right to free exercise and the press, he wanted to be compensated for the materials, "as a lesson that [deprivation of the materials] is not going to be tolerated without repercussions, and to ensure that no one else of his faith [was] "bullied" by I.S.U.'s policies." (Id.) On December 13, 2002, the second level reviewer rejected plaintiff's arguments, explaining that after interviewing Officer Feudner, the I.S.U. officer who reviewed the confiscated materials, it was determined that plaintiff failed to support his complaint with sufficient facts to demonstrate that the pamphlets were considered religious materials and not that of "Neo-Nazi, SkinHead and White Supremacist (Racial Hatred)." (Id.) The reviewer found that, based on a reasonable penological interest, it was reasonable to conclude that the pamphlets were contraband and, therefore, not permitted while plaintiff was incarcerated at SQSP. (Id.) The reviewer instructed plaintiff to fill out a Trust Withdrawal Form with a forwarding address by January 24, 2003, if plaintiff wished to mail the pamphlets somewhere outside the institution. (Id.) Plaintiff did not do so.

1  Plaintiff appealed this decision to the Director's level, stating that the policy for non-permitted items in the institution should not affect his religious materials. (Id.) Plaintiff requested that he either be reimbursed for the deprivation or permitted to keep the materials. (Id.) Plaintiff's appeal was denied on the grounds that the decision to confiscate the materials was based on a reasonable penological interest. (Id.)

## LEGAL STANDARD

Summary judgment is properly granted when no genuine and disputed issues of material fact remain and when, viewing the evidence most favorably to the non-moving party, the movant is clearly entitled to prevail as a matter of law. Fed. R. Civ. P. 56; Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Eisenberg v. Ins. Co. of N. Am., 815 F.2d 1285, 1288-89 (9th Cir. 1987).

The moving party bears the burden of showing that there is no material factual dispute. Therefore, the court must regard as true the opposing party's evidence, if supported by affidavits or other evidentiary material. Celotex, 477 U.S. at 324; Eisenberg, 815 F.2d at 1289. The court must draw all reasonable inferences in favor of the party against whom summary judgment is sought. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Intel Corp. v. Hartford Accident & Indem. Co., 952 F.2d 1551, 1558 (9th Cir. 1991).

Material facts which would preclude entry of summary judgment are those which, under applicable substantive law, may affect the outcome of the case. The substantive law will identify which facts are material. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). Where the moving party does not bear the burden of proof on an issue at trial, the moving party may discharge its burden of showing that no genuine issue of material fact remains by demonstrating that "there is an absence of evidence to support the nonmoving party's case." Celotex, 477 U.S. at 325. The burden then shifts to the opposing party to produce "specific evidence, through affidavits or admissible discovery material, to show that the dispute exists." Bhan v. NME Hosps., Inc., 929 F.2d 1404, 1409 (9th Cir. 1991). A complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial. Celotex, 477 U.S. at 323.

**ANALYSIS**

Plaintiff raised three cognizable claims. First, plaintiff alleges that his First Amendment right to free exercise of religion was violated because his religious and cultural materials were confiscated from him without relation to any penological interest and without those materials, plaintiff maintains that he cannot practice his religion. Second, plaintiff alleges that Thompson confiscated those materials based upon political bias and violated his right to free speech. Finally, plaintiff asserts that he was deprived of his property pursuant to an authorized state procedure without procedural due process of law.

I.   <u>First Amendment claims</u>

Thompson argues that he is entitled to judgment as a matter of law. Specifically, he states that while prisoners retain some constitutional protections, prison regulations including the one at issue here authorizing confiscation of plaintiff's materials, are valid if they are reasonably related to legitimate penological interests.[4] Thompson asserts that publications by the 14 Word Press were confiscated because the materials "promoted neo-Nazi, skinhead and white-supremacist ideologies" which threatened the security of inmates and prison staff. (Decl. Quinn at ¶ 5.) Therefore, he concludes, prison officials found that the 265 pamphlets by 14 Word Press were so inflammatory that they were likely to incite prison violence.

Plaintiff claims that Thompson's deprivation of his materials violated his right to free exercise of religion because he has no funds to re-purchase the materials and the only way to practice Odinism is through study of materials. (SAC at ¶ 12.) Plaintiff insists that without the materials, he cannot practice his faith. (<u>Id.</u>) Plaintiff further argues that withholding the materials based on their content violated his right to free speech. Plaintiff refutes Thompson's assertion that the 265 pamphlets advocated any violence or "call to arms." (Opp. at 6-7.) "The pamphlets may contain a separatist ideology as to the preservation of ones [sic] culture and race as a means to avoid cultural genocide, but it also in advocating that, teaches Odinism and norse

---

[4] The court notes that Thompson does not dispute that plaintiff's belief in Odinism is "sincerely held" and "rooted in religious belief." <u>See</u> <u>Shakur v. Schriro</u>, 514 F.3d 878, 883-84 (9th Cir. 2008). Thus, there is no dispute that the Free Exercise Clause applies to plaintiff's claim. <u>See id.</u>

mythology and history." (Id. at 6.)

"Prison walls do not form a barrier separating prison inmates from the protections of the Constitution." Turner v. Safley, 482 U.S. 78, 84 (1987). Where prison rules or regulations impede the exercise of a prisoner's constitutional rights, federal courts must discharge their duty to protect those rights. See id. However, courts must be aware that they are "ill equipped to deal with the increasingly urgent problems of prison administration and reform." Id. (citation and internal quotation marks omitted). Where the regulations of a state prison are involved, "federal courts have . . . additional reason to accord deference to the appropriate prison authorities." Id. at 85 (citation and internal quotation marks omitted).

In order to establish a free exercise violation, a prisoner must show a defendant burdened the practice of his religion without any justification reasonably related to legitimate penological interests. See Shakur v. Schriro, 514 F.3d 878, 883-84 (9th Cir. 2008). A prison regulation that limits a prisoner's exercise of his constitutional rights will thus be upheld where it "reasonably relate[s] to a legitimate penological interest." Turner, 482 U.S. at 89-90. This determination entails consideration of four factors: (1) whether there is a rational relationship between the regulation and the proffered legitimate government interest; (2) whether inmates have alternative means of exercising their asserted rights; (3) how accommodation of the claimed constitutional right will affect guards, a prisoner's fellow inmates, and the allocation of prison resources; and (4) whether the policy is an "exaggerated response" to the prison's concerns. Id.

The Supreme Court requires that prison officials be given broad discretion in limiting the possession of publications in a volatile prison environment because of the concern that materials targeted to a general audience can circulate among prisoners and cause disruption and disorder. See Thornburgh v. Abbott, 490 U.S. 401, 413 (1989) ("The problem is not . . . in the individual reading the materials in most cases. The problem is in the material getting into the prison.").

In Stefanow v. McFadden, 103 F.3d 1466 (9th Cir. 1996), the Ninth Circuit applied the Turner factors and upheld the confiscation of a publication entitled, "Christianities Ancient Enemy." Id. at 1472-1475. The court concluded that prison officials' security concerns regarding possession of the book inside the institution was not unreasonable. Id. at 1473. It

1 found that the book promoted the idea that "white Christians are being opposed by a worldwide
2 conspiracy – a conspiracy that controls the government of the United States and, by implication,
3 the prisons. The book issues a call to arms for white Christians to fight back in a 'war for
4 survival.'" Id. Thus, the court deferred to the prison officials' concern that the material was so
5 inflammatory that it would reasonably incite violence in the institution. Id.

6 On the other hand, in McCabe v. Arave, 827 F.2d 634 (9th Cir. 1987), the Ninth Circuit
7 applied the Turner factors and rejected a ban on storing Church Jesus Christ Christian ("CJCC")
8 literature in the chapel library. Id. at 637-638. CJCC promoted beliefs of the Aryan Nation and
9 its Reverend encouraged racial hatred and revenge. Id. at 636. However, the Ninth Circuit
10 reiterated that while prisons may sometimes constitutionally regulate content, those regulations
11 are not without limit. Id. at 638. "[L]iterature advocating racial purity, but not advocating
12 violence or illegal activity as a means of achieving this goal, and not so racially inflammatory as
13 to be reasonably likely to cause violence at the prison, cannot be constitutionally banned as
14 rationally related to rehabilitation." Id.

15 The court notes that neither party submitted any evidence regarding the specific content
16 of any of the pamphlets, much less all 265 of them.[5] Without such evidence, there are genuine
17 issues of material fact as to whether any of the 265 pamphlets advocated violence or were
18 reasonably likely to cause violence at the prison and whether the decision to confiscate those
19 pamphlets was rationally related to a legitimate government interest. Accordingly, defendant's
20 motion for summary judgment is DENIED WITHOUT PREJUDICE. Defendant may bring a
21 renewed summary judgment motion on this issue if he can make the proper evidentiary showing.
22 Plaintiff is permitted to also file a summary judgment if he can support an argument that he is
23 entitled to judgment as a matter of law.

24 II.     Procedural Due Process

25 Defendant argues he did not destroy plaintiff's documents. He took them to a storage
26 room for review and then the pamphlets were forwarded to I.S.U. (Decl. Quinn at ¶ 5.) Plaintiff

---

[5] While the plaintiff did submit a copy of a pamphlet published by 14 Word Press, it is unclear whether it is a copy of one of the 265 pamphlets confiscated. (Opp. Ex. 1.)

Order Granting in Part and Denying in Part Defendants' Motion for Summary Judgment
P:\PRO-SE\SJ.Rmw\CR old\CR.03\Avery233msj.wpd     7

was told that the material was considered contraband and was given the opportunity to mail them to somewhere outside the prison. (Id.) Further, Thompson argues that the seizing of his materials was part of normal prison procedure.

Plaintiff insists that Thompson failed to abide by the prison regulations. Specifically, Thompson neglected to write "hot property" on plaintiff's receipt, thus, failing to notify him that any of his property had been stored as contraband. Thus, contends plaintiff, he was deprived of his pre-deprivation procedures as provided by the regulations. (Opp. at 10-12.) Plaintiff also alleges that the CDCR adopted regulations to ensure due process and Thompson violated those regulations.

The Due Process Clause of the Fourteenth Amendment protects individuals against governmental deprivations of "life, liberty or property," as those words have been interpreted and given meaning over the life of our republic, without due process of law. Board of Regents v. Roth, 408 U.S. 564, 570-71 (1972). In order to state a claim of deprivation of due process, a plaintiff must allege the existence of a liberty or property interest for which the protection is sought. See id. at 569. Due process protects against the deprivation of property where there is a legitimate claim of entitlement to the property. See id. at 577.

If the deprivation is the result of "established state procedure," the availability of some post-termination tort action does not necessarily provide due process. See Logan v. Zimmerman Brush Co., 455 U.S. 422, 435-37 (1982) (failure on part of state commission to hold hearing within statutory time limits not permitted to terminate timely filed claim). Parratt does not apply where the state has procedures designed to control the actions of state officials and the officials act pursuant to those procedures. See Zimmerman v. City of Oakland, 255 F.3d 734, 738 (9th Cir. 2001) (citing Parratt v. Taylor, 451 U.S. 527, 535-44 (1981)). In those instances, the Fourteenth Amendment requires "'an opportunity . . . granted at a meaningful time and in a meaningful manner,'. . . for a hearing appropriate to the nature of the case." Logan, 455 U.S. at 437. Due process is violated where a deprivation is predictable and pre-deprivation process possible, but state officials, acting under apparent authority of state procedures, provide no pre-deprivation procedure and are specifically charged with the authority to effect the deprivation

complained of.  See Zimmerman, 255 F.3d at 739.

Where a prisoner alleges the deprivation of a property interest caused by the unauthorized action of a prison official, however, there is no claim cognizable under 42 U.S.C. § 1983 if the state provides an adequate post-deprivation remedy.  See Zinermon v. Burch, 494 U.S. 113, 128-32 (1990) (where state cannot foresee, and therefore provide meaningful hearing prior to, deprivation statutory provision for post-deprivation hearing or common law tort remedy for erroneous deprivation satisfies due process).  A state's post-deprivation remedy may be adequate even though it does not provide relief identical to that available under § 1983.  See id. at 531 n.11.  California law provides such an adequate post-deprivation remedy.  See Barnett v. Centoni, 31 F.3d 813, 816-17 (9th Cir. 1994) (citing Cal. Gov't Code §§ 810-895).

Here, the parties do not dispute that plaintiff had a protectable property interest in his 265 pamphlets.  Viewing the evidence in the light most favorable to plaintiff, there is no dispute that Thompson was supposed to make a notation of "hot property" on plaintiff's receipt, pursuant to authorized prison procedure.  Thus, because his failure to do so was unauthorized and contrary to prison policy, plaintiff does not state a due process claim.  See Parratt, 451 U.S. at 535-44 (concluding that there is no due process claim for a random and unauthorized deprivation by state officials); see, e.g., Daniels v. Williams, 474 U.S. 327, 330-331 (1986) (negligent conduct causing deprivation of life, liberty or property does not implicate Fourteenth Amendment concerns); Hudson v. Palmer, 468 U.S. 517, 533 (1984) (unauthorized intentional destruction of inmate's property does not violate due process); cf. Sorrells, 290 F.3d at 972-73.

Even assuming Thompson's actions were pursuant to an authorized state policy, plaintiff's claim does not survive summary judgment.  Specifically, plaintiff states that after he was told that his property had been sent to I.S.U., he sought administrative remedies through the first, second, and Director's levels of review.  Prior to the final review, plaintiff was given an opportunity to send the property to an outside address.  Despite receiving these opportunities to be heard, plaintiff still contends that he was entitled to more process.  However, he fails to support such a claim with sufficient evidence or facts.  Cf. Hewitt v. Helms, 459 U.S. 460, 476 (1983) (in the context of administrative segregation, requiring only "some notice of the charges

1  against him and an opportunity to present his views to the prison official charged with the
2  decision of transfer).  The record demonstrates that plaintiff was provided with notice (although
3  plaintiff was informed that his property was confiscated only after he inquired about it) and an
4  opportunity to be heard, which is the procedural process plaintiff was due.  Cf. Toussaint v.
5  McCarthy, 801 F.2d 1080, 1100 (9th Cir. 1986), abrogated in part on other grounds by Sandin
6  v. Conner, 515 U.S. 472 (1995).  Thus, there are no genuine issues of material fact and
7  Thompson's motion for summary judgment as to plaintiff's procedural due process claim is
8  GRANTED.

## CONCLUSION

10  1.  Defendant's motion for summary judgment is GRANTED in part and DENIED in
11  part.  The motion is GRANTED as to plaintiff's procedural due process claim.  However,
12  summary judgment is DENIED without prejudice to re-filing as to plaintiff's First Amendment
13  claims.

14  2.  No later than **sixty (60) days** from the date of this order, the parties shall file a
15  motion for summary judgment with respect to the First Amendment claims based on additional
16  evidence, or notify the court that they are of the opinion that this case cannot be resolved by such
17  a motion.

18  Any motion for summary judgment shall be supported by adequate factual documentation
19  and shall conform in all respects to Rule 56 of the Federal Rules of Civil Procedure.  **The
20  parties are advised that summary judgment cannot be granted, nor qualified immunity
21  found, if material facts are in dispute.  If either party is of the opinion that this case cannot
22  be resolved by summary judgment, he shall so inform the court prior to the date the
23  summary judgment motion is due.**

24  3.  The opposition to dispositive motions shall be filed with the court and served on
25  defendant no later than **thirty (30) days** from the date the motion is filed.

In the event a defendant files a motion for summary judgment, the Ninth Circuit has held that the following notice should be given to plaintiffs:[6]

> The defendants have made a motion for summary judgment by which they seek to have your case dismissed. A motion for summary judgment under Rule 56 of the Federal Rules of Civil Procedure will, if granted, end your case.
>
> Rule 56 tells you what you must do in order to oppose a motion for summary judgment. Generally, summary judgment must be granted when there is no genuine issue of material fact--that is, if there is no real dispute about any fact that would affect the result of your case, the party who asked for summary judgment is entitled to judgment as a matter of law, which will end your case. When a party you are suing makes a motion for summary judgment that is properly supported by declarations (or other sworn testimony), you cannot simply rely on what your complaint says. Instead, you must set out specific facts in declarations, depositions, answers to interrogatories, or authenticated documents, as provided in Rule 56(e), that contradict the facts shown in the defendants' declarations and documents and show that there is a genuine issue of material fact for trial. If you do not submit your own evidence in opposition, summary judgment, if appropriate, may be entered against you. If summary judgment is granted in favor of defendants, your case will be dismissed and there will be no trial.

See Rand v. Rowland, 154 F.3d 952, 963 (9th Cir. 1998) (en banc). Plaintiff is advised to read Rule 56 of the Federal Rules of Civil Procedure and Celotex Corp. v. Catrett, 477 U.S. 317 (1986) (holding party opposing summary judgment must come forward with evidence showing triable issues of material fact on every essential element of his claim). Plaintiff is cautioned that failure to file an opposition to defendant's motion for summary judgment may be deemed to be a consent by plaintiff to the granting of the motion, and granting of judgment against plaintiff without a trial. See Ghazali v. Moran, 46 F.3d 52, 53-54 (9th Cir. 1995) (per curiam); Brydges v. Lewis, 18 F.3d 651, 653 (9th Cir. 1994).

4.  The parties shall file a reply brief no later than **fifteen (15) days** after any opposition is filed.

5.  The motion shall be deemed submitted as of the date the reply brief is due. No hearing will be held on the motion unless the court so orders at a later date.

6.  All communications by the plaintiff with the court must be served on defendant's counsel, by mailing a true copy of the document to defendant's counsel.

---

[6]The following notice is adapted from the summary judgment notice to be given to pro se prisoners as set forth in Rand v. Rowland, 154 F.3d 952, 963 (9th Cir. 1998) (en banc). See Wyatt v. Terhune, 315 F.3d at 1120 n.14.

Order Granting in Part and Denying in Part Defendants' Motion for Summary Judgment
P:\PRO-SE\SJ.Rmw\CR old\CR.03\Avery233msj.wpd   11

1        7.      Discovery may be taken in accordance with the Federal Rules of Civil Procedure.
2  No further court order is required before the parties may conduct discovery.
3        8.      It is plaintiff's responsibility to prosecute this case. Plaintiff must keep the court
4  and all parties informed of any change of address and must comply with the court's orders in a
5  timely fashion. Failure to do so may result in the dismissal of this action for failure to prosecute
6  pursuant to Federal Rule of Civil Procedure 41(b).
7        This order terminates docket number 51.
8        IT IS SO ORDERED.
9  DATED: 10/4/10

*/s/ Ronald M. Whyte*
RONALD M. WHYTE
United States District Judge